AO 91 (Rev. 11/11)  Criminal Complaint





# UNITED STATES DISTRICT COURT

for the

Northern District of California

**FILED**

OCT 13 2015

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) 4-15-71338 MAG |
| GABRIEL D. ESTRADA, | ) ⎯ Case No. |
| | ) |
| | ) OAKLAND VENUE |
| | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____(See Below)*_____ in the county of _____Contra Costa_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1),(b)(A)(viii) | Conspiracy to possess with intent to distribute and distribution of controlled substances, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers |

*Conspiracy dates: beginning on a date unknown, but no later than August 13, 2015 and continuing to October 12, 2015.

Penalties: Mandatory 10 years imprisonment and maximum life; $10,000 fine; Mandatory 5 years and maximum life supervised release; and $100 special assessment

This criminal complaint is based on these facts:

See attached affidavit of Special Agent William Sicord

Approved As To Form:

_KATIE B. MEDEARIS AUSA_

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent William Sicord
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _10/13/15_

_____
*Judge's signature*

City and state: _____Oakland, California_____

Hon. Donna M. Ryu
*Printed name and title*

BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

KATIE BURROUGHS MEDEARIS (CABN 262539)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    katie.medearis@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
|     Plaintiff, | AFFIDAVIT OF SPECIAL AGENT WILLIAM F. SICORD IN SUPPORT OF CRIMINAL COMPLAINT |
|     v. | |
| GABRIEL D. ESTRADA, | ~~UNDER SEAL~~ |
|     Defendant. | |

    I, Special Agent ("SA") William Sicord of the United States Department of Justice, Drug Enforcement Administration ("DEA") do swear and affirm as follows:

**I.    INTRODUCTION**

    **A.    <u>Purpose of Affidavit</u>**

    1.    I make this affidavit in support of a criminal complaint against Gabriel D. ESTRADA (hereafter, "ESTRADA") for violations of Title 21, United States Code, Sections 846 and 841 (a)(1),(b)(1)(A)(viii) (conspiracy to possess with intent to distribute and distribution of controlled

1  substances, including cocaine and 50 grams or more of methamphetamine, its salts, isomers, and salts of

2  its isomers).

3      **B.**     **Sources of information**

4      2.      The facts and information set forth in this Affidavit have been acquired through various

5  investigative techniques, including, but not limited to: the use of an undercover officer; recorded

6  telephone calls (voice and electronic); information received via multiple Federal Title III wiretap[1]

7  intercepts (including wire and electronic communications) on cellular devices used by Carlos

8  OLIVARES HERNANDEZ and others during periods of interception;[2] telephone toll analysis; agent-

---

[1] DEA has conducted multiple wiretaps in the instant investigation. Most recently, on October 9, 2015, agents began intercepting the wire and electronic communications of a successor cellular telephone used by a co-conspirator of ESTRADA's, Carlos OLIVARES HERANDEZ, and bearing number (909) 528-3824 (hereafter, the "Intercepted Telephone 4"), pursuant to a federal court order. Case No. CR-15-90893-MISC-PJH. Previously, on August 12, 2015, the DEA began intercepting the wire and electronic communications of multiple cellular telephone numbers, including (530) 415-6977 (referred to hereafter, the "Intercepted Telephone 3"), which is a predecessor telephone used by OLIVARES HERANDEZ, pursuant to a federal court order. Case No. CR-15-90714-MISC-PJH. DEA has also intercepted the communications of other cellular telephones in this matter, pursuant to federal court order(s).

[2] Throughout this Affidavit, I describe some, but not all, of the voice and text message conversations between OLIVARES HERNANDEZ and others recorded during the course of this investigation. Many of these communications are draft translations and/or summaries of wire or electronic communications occurring in the Spanish language and were generated with the assistance of Spanish language monitors. These draft summaries or translations may change before converted to final form.

My summary of these conversations is based on my and/or other investigators review of the recordings of the conversations, my training, experience, and knowledge of this investigation, and information provided to me by other experienced law enforcement personnel as to the meaning of vague or coded language and certain words and phrases, as well as the practices of the individuals involved in the manner in which certain crimes are committed. Despite the draft nature of these summaries, I have included in quotation marks in some instances in an attempt to provide a draft transcript of some of the speaker's words during the conversations.

In addition, I know, based on my training, experience, and knowledge of this investigation, that individuals engaging in narcotics trafficking frequently use slang or coded or intentionally vague language when discussing illegal activity. When a word or phrase used by a speaker constitutes slang or coded or intentionally vague language (or whose meaning would not be obvious), I have provided my interpretation of those words and/or phrases in parentheses or described my understanding following reference to the code/slang. My interpretation is based on my training and experience regarding narcotics traffickers, my knowledge of and participation in this investigation, and my discussions with other experienced law enforcement personnel. My interpretation of these communications, however, may change as additional information is learned through the course of the investigation. The actual names of the sender/receivers have been used where agents believe they have determined the identity of the sender/receiver with some certainty.

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1 directed and observed drug purchases by a UC from individual(s) supplied by OLIVARES

2 HERNANDEZ's drug trafficking organization ("DTO"); physical and electronic surveillance

3 operations; the use of public and law enforcement databases; information obtained from sources who

4 have knowledge of the criminal activities of the subjects of the investigation and their co-conspirators;

5 and conversations with and/or review of reports drafted by other federal, state, and local law

6 enforcement officials.[3]  I am also familiar with the facts and circumstances of this case as a result of my

7 personal participation in this investigation.  I believe the information gathered from the aforementioned

8 list of sources and investigative techniques to be reliable.  Because this Affidavit is submitted for the

9 limited purpose of setting forth probable cause for the requested Complaint, I have not included each

10 and every fact known to me concerning this investigation.  Rather, I have included what I believe to be

11 adequate facts to establish probable cause that evidence of alleged violations have been committed by

12 ESTRADA.  I do not rely on facts not set forth herein to support my conclusion that such probable cause

13 has been established.

14      3.    Further, my beliefs, conclusions, and opinions set forth throughout this Affidavit (often

15 prefaced with the phrase "I believe") are based on my experience and training as a DEA Special Agent,

16 as well as the training and experience of other agents, deputies, and officers assisting in this

17 investigation, my familiarity with the methods used by narcotics traffickers to import, manufacture, and

18 distribute illegal narcotics and collect and launder the proceeds from the sales of illegal narcotics, my

19 direct participation in this investigation, and conversations with other law enforcement personnel

20 familiar with this investigation and/or the methods of operation used by narcotics traffickers.

21 **II.    AFFIANT BACKGROUND AND APPLICABLE LAW**

22     **A.    <u>Agent Experience and Background</u>**

23     4.    I am an "investigative or law enforcement officer of the United States" within the

24 meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who

25 is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18

26

27        [3] Of note, I have used the term "agents" throughout this Affidavit to identify other agents or local

28 law enforcement officers who have made observations during the course of this investigation.

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1  U.S.C. § 2516.

2    5.    I am a Special Agent of the United States Department of Justice, Drug Enforcement

3  Administration (DEA), and have been so employed for 24 years. I am currently assigned to the San

4  Francisco Field Division Office. As such, I am empowered by law to investigate, and to make arrests

5  for, offenses enumerated in 18 U.S.C. § 2516, and I am considered an "investigative or law enforcement

6  officer" within the meaning of 18 U.S.C. § 2510(7).

7    6.    For approximately five years of those 24 years, I was a Group Supervisor at the San

8  Francisco International Airport Task Force and the San Francisco Metropolitan Task Force. As an

9  agent, I spent over 19 years investigating narcotics traffickers - mostly in California - who were large-

10  scale, Mexico-based organizations that trafficked heroin, cocaine, and methamphetamine across multiple

11  jurisdictions. I have participated in over 500 drug investigations and the execution of over 100

12  search/arrest warrants. Through this experience, I have gained expertise in the use of a variety of law

13  enforcement techniques, including the application for and utilization of electronic interceptions, the use

14  of confidential sources, the use of undercover techniques, physical surveillance, electronic surveillance,

15  the utilization of digital number recorders, telephone toll analysis, the analysis of seized records, drug

16  evidence, and taped conversations.

17    7.    I have monitored, supervised, conducted surveillance, been the affiant for, or otherwise

18  participated in over 75 investigations that utilized electronic intercepts. I have attended several training

19  classes specializing in conducting electronic surveillance. In addition to the wiretaps on which I have

20  been the affiant, I have assisted in the writing, editing, and reviewing of approximately 100 other federal

21  and state affidavits made in support of electronic interception requests by other agents in the DEA,

22  Federal Bureau of Investigation agents, or task force officers. I have attended approximately 20 strategy

23  conferences with agents from around the U.S. and Mexico in which agents discussed the content of their

24  wiretaps investigations and methods used in targeting Mexican Drug Trafficking Organizations

25  (hereinafter, "DTOs"). I have had the opportunity to monitor; listen to; review transcripts, line sheets, or

26  monitor's logs of; or otherwise discussed with linguists the content of over 30,000 intercepted

27  conversations. The majority of these intercepted conversations occurred in Spanish and involved the

28
SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1    trafficking of heroin, cocaine, methamphetamine, or marijuana by Mexican DTOs and employed some

2    form of code to thwart law enforcement.  I have also debriefed or interviewed approximately 100 people

3    through proffer and U.S. Sentencing Guidelines "safety-valve" interviews of drug dealers or confidential

4    sources (informants), many of whom were themselves targets of electronic surveillance, or were

5    otherwise at some point drug dealers experienced in speaking in coded conversation over the telephone.

6    In these interviews and debriefings, I was able to speak with convicted drug traffickers about specific

7    conversations in which they were intercepted over the electronic surveillance.  In doing so, I was able to

8    compare my initial interpretations of their conversations with the actual meaning of those conversations

9    as explained to me by a person involved in those conversations.  Thus, as a result of debriefing the

10   targets of the actual intercepts, I was able to confirm or dispel my initial conclusions or interpretations

11   and thereby learn from my experiences.

12         8.      In the last 24 years, I have had the opportunity to speak with other experienced law

13   enforcement officers and prosecutors regarding the application and use of electronic surveillance,

14   especially as it pertains to targeting Mexican DTOs trafficking narcotics internationally or across

15   multiple jurisdictions within the United States.

16         9.      Prior to gaining this experience, I attended and graduated from the DEA Basic Agent

17   School at the Drug Enforcement Administration Academy in Quantico, Virginia, where I received over

18   14 weeks of comprehensive, formalized instruction, in such matters including drug identification,

19   detection, and interdiction; organizations involving the smuggling, cultivation, manufacturing, and the

20   illicit trafficking of controlled substances; confidential source management; money laundering

21   techniques and asset identification, seizure, and forfeiture.  Additionally, since graduating from the DEA

22   Basic Agent Academy, I have attended no less than five conferences, schools, and/or courses during

23   which I received further training in the laws and/or investigative techniques relating to wire and

24   electronic surveillance, money laundering and asset forfeiture, advanced agent training, the Group

25   Supervisors School, Advanced Undercover, and Street Gangs.  I have been certified on two occasions by

26   the State of California to conduct electronic surveillance.

27         10.     By virtue of my training and experience, and through my conversations with other agents

28

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1 and law enforcement officers that conduct drug investigations, I have become familiar with the methods

2 used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by

3 drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

**B.   Applicable Law**

11.   Title 21, United States Code, Sections 841 and 846 prohibit a person from manufacturing,

distributing, dispensing, or possessing with intent to manufacture, distribute or dispense a controlled

substance and from conspiring to commit any of the aforementioned crimes.  The elements each of the

above-listed offenses are described in greater particularity below:

(a)   21 U.S.C. § 841(a)(1):  the defendant (1) knowingly manufactured, distributed,

dispensed, or possessed with the intent to manufacture, distribute, or dispense; (2) a controlled

substance.

(b)   21 U.S.C. § 846: the defendant (1) had an agreement to accomplish an illegal

objective, *i.e.*, a violation of 21 U.S.C. § 841(a)(1); and (2) had the intent to commit the

underlying offense.

Per 21 U.S.C. § 841(b)(1)(A)(viii), any person who violates § 841(a)(1) in a case involving 50 grams or

more of methamphetamine, its salts, isomers, and salts of its isomers is subject to a mandatory minimum

term of imprisonment of ten years and a maximum penalty of life imprisonment.

**III.   FACTS ESTABLISHING PROBABLE CAUSE**

**A.   Overview of Investigation**

12.   Beginning in June of 2015, members of the DEA and  the Concord Police Department

("CPD") began an investigation into the methamphetamine and cocaine trafficking activities of Carlos

OLIVARES HERNANDEZ (hereafter, "OLIVARES HERNANDEZ").  To date, the investigation has

revealed that OLIVARES HERNANDEZ receives bulk quantities of methamphetamine and cocaine

from couriers based in Southern California and Mexico.[4]  Agents further believe that OLIVARES

---

[4] For example, within the last 60 days, law enforcement seized approximately 33 pounds of suspected methamphetamine from a courier who had been communicating with OLIVARES HERNANDEZ via the Intercepted Telephone 3 about his/her travel from Southern California to the Central Valley.  (The seized substance tested positive for the presence of methamphetamine during a field analysis and its appearance was consistent with that of crystal, i.e. higher purity, methamphetamine.)  During these interceptions, which occurred shortly before the courier was stopped

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

6

1  HERNANDEZ acts as a distributor for the subject drug trafficking organization ("DTO") and he is

2  based in the Central Valley.  Agents also believe OLIVARES HERNANDEZ and his associates sell

3  and/or distribute drugs in the Central Valley, the San Francisco Bay Area, and other locations.  One

4  example of drug distribution connected to the Northern District of California ("NDCA") involves

5  OLIVARES HERNANDEZ's supply of cocaine to a co-conspirator/dealer, who resold the supplied

6  cocaine to a CPD undercover officer (hereafter, "UC") in this investigation.  This transaction and its

7  connection to the NDCA are discussed in greater detail below.

8        13.     Through the course of the subject wiretap investigation, agents identified ESTRADA as

9  one of OLIVARES HERNANDEZ's co-conspirators and a fellow member of the same DTO.[5]  On

10  October 12, 2015, ESTRADA was arrested after he visited a suspected drug stash location used by the

11  DTO.  At the time of his arrest, ESTRADA was in possession of bulk currency, which was secreted

12  inside his vehicle.  The subject affidavit will first address ESTRADA's arrest and then provide

13  additional information regarding the subject DTO and ESTADA's involvement in its illegal activities.

14        **B.     October 12, 2015: Arrest of Gabriel ESTRADA in Possession of Bulk Currency**

15        14.     On October 12, 2015, the California Highway Patrol ("CHP") initiated a traffic stop on a

16  vehicle operated by ESTRADA in the California Central Valley.  Roughly one hour prior to the traffic

17  stop, agents observed ESTRADA departing from a suspected drug stash location at 13697 South Avenue

18  in Delhi, California (hereafter, "13697 South Ave.").[6]  The CHP officer identified ESTRADA via his

19  California Driver's license and ESTRADA was the sole occupant of the vehicle.  Based on ESTRADA's

20  behavior during the stop, as well as information previously provided by the DEA, the CHP Officer used

21

---

22  by law enforcement, OLIVARES HERNANDEZ had been providing directions regarding his
   approximate location to the courier.  Law enforcement discovered the methamphetamine packaged

23  within hidden compartments in the courier's vehicle.  On October 13, 2015, agents began searching a
   suspected drug stash location used by the subject DTO and located at 13697 South Avenue in Delhi,

24  California.  During their initial search, agents discovered at least one plastic box matching the type used
   to store the methamphetamine concealed within and seized from the courier's vehicle.  Based on the

25  interceptions, and other facts established herein, I believe the subject DTO and related conspiracy
   regularly traffics in multi-pound/kilogram quantities of methamphetamine and cocaine.

26        [5] Of note, the facts discussed herein represent some of the investigation that led up to

27  ESTRADA's arrest, but are not inclusive of all interactions with or evidence against ESTRADA, his co-
   conspirators, and/or other members of the subject DTO.

28        [6] The significant of this address is described in subsequent portions of this Affidavit.

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

1  a K-9 certified in the detection of the odor of narcotics to conduct an exterior "sniff" of ESTRADA's

2  vehicle.  The K-9 alerted for the presence of a narcotics odor at the rear of the pickup truck operated by

3  ESTRADA.  During a search of the bed of the truck, the CHP officer located 16 individually wrapped

4  plastic bags hidden between the truck bed liner and body of the truck.  Agents estimate the sum of the

5  seized currency is between $300,000 and $500,000.[7]  Based on the facts provided herein, I believe the

6  seized currency is proceeds of drug-trafficking.

7         15.     For reference, a photograph of the packaged, seized bulk cash obtained from the truck

8  bed liner is included below:



16         16.     In the morning of October 13, 2015, agents began searching the above-mentioned

17 suspected drug stash location at 13697 South Ave., pursuant to a search warrant issued by a U.S.

18 Magistrate Judge in the Eastern District of California.  This location was visited by ESTRADA prior to

19 his arrest.  During agent's initial search of the premises, they discovered bags and wrapping materials

20 matching those used to package the currency seized from ESTRADA.

21         17.     Based on the facts described herein, I believe there is probable cause to conclude the

22 following: (1) ESTRADA conspires with one or more other individuals to distribute drugs; and (2) the

23 money seized from his vehicle are proceeds derived from the sale of such contraband.  I further believe

24 the facts outlined herein establish probable cause that ESTRADA is likely based in the Los Angeles area

---

[7] Agents have not yet counted the seized currency.  The estimated value is based on the weight of the packages, approximate currency weights and values, the size and appearance of the bundles, and previously intercepted communications discussing the value of prior, suspected drug proceed pick-ups in the instant investigation.

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1   and he travels throughout California and Mexico to distribute drugs and/or collect drug-related proceeds.

2   **C.   Intercepted phone calls and surveillance of ESTRADA**

3   18.   On August 12, 2015, the Honorable Phyllis J. Hamilton, District Court Judge for the

4   Northern District of California, issued an order authorizing the interception of OLIVARES

5   HERNANDEZ's wire and electronic communications via Intercepted Telephone 3. During the course

6   of the interceptions, agents identified ESTRADA as one of OLIVARES HERNANDEZ's co-

7   conspirators. A summary of some of the intercepted communications and related surveillance

8   observations demonstrating his role as a co-conspirator in the subject DTO are outlined below.

9   *1.   August, 2015: Surveillance Operations and Related Calls Involving ESTRADA*

10   19.   On August 13, 2015, agents intercepted a series of calls via the Intercepted Telephone 3,

11   which indicated OLIVARES HERNANDEZ and an Unidentfied Male ("UM") 38 (hereafter, UM 38")

12   were expecting a delivery of narcotics from ESTRADA.

13   20.   For example, at approximately 11:36 a.m., agents intercepted a call to OLIVARES

14   HERNANDEZ via the Intercepted Telephone 3 from ESTRADA, who used (909) 963-4429. During the

15   call, OLIVARES HERNANDEZ and ESTRADA used coded language to discuss the delivery of drugs

16   from Southern California to the Delhi, California area. A summary of their conversation, in pertinent

17   part, and my understanding of its significance are described below:

18   a.   Conversation: ESTRADA told OLIVARES HERNANDEZ, "I am on my way

19   there, I am by the mountain/hill now." ESTRADA went on to say, "I will be there in whatever

20   time it takes to get there from the mountain/hill." OLIVARES HERNANDEZ acknowledged.

21   Then, ESTRADA asked, "Where is it going to be? Is it going to be there with the man or with

22   Guero?" OLIVARES HERNANDEZ responded, "At the man's." ESTRADA said, "I will arrive

23   there because my phone is about to die and I don't have a charger. I will be there."

24   b.   Significance of Conversation: Based on the conversation above, and subsequent

25   conversations and surveillances discussed in detail below, I believe ESTRADA told OLIVARES

26   HERNANDEZ that he was in route from Southern California to OLIVARES HERNANDEZ's

27   location and he had crossed the "grape vine" on Interstate Highway 5. I further believe

28

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

1    ESTRADA's vehicle contained an unknown type and quantity of drugs and he asked

2    OLIVARES HERNANDEZ whether the drugs should be delivered to one of two other co-

3    conspirators ("Guero" or a person simply referred to as "the man").[8]

4        21.    Later that afternoon, at approximately 3:54 p.m, agents intercepted another call from

5    ESTRADA to OLIVARES HERNANDEZ. During this call, the participants discussed their respective

6    locations and meeting one another. Soon thereafter, agents followed OLIVARES HERNANDEZ to

7    13697 South Ave. A summary of their conversation, in pertinent part, and my understanding of its

8    significance are described below:

9        a.    <u>Conversation</u>: ESTRADA said he was "there," but "they" were "working."

10   OLIVARES HERNANDEZ then replied that he was "on his way." ESTRADA responded, "we

11   are here."

12       b.    <u>Significance of the Conversation</u>: I believe this conversation is significant and

13   relates to coordinating a meeting regarding drug trafficking activities. More specifically, I

14   believe ESTRADA notified OLIVARES HERNANDEZ that he had arrived from Southern

15   California and was at 13697 South Avenue, Delhi, California with their co-conspirator, "Guero."

16   I also believe ESTRADA's use of the term "working" was a coded reference to conducting drug-

17   trafficking related activities, i.e. the unloading drugs secreted inside of vehicles equipped with

18   hidden compartments. I further believe that OLIVARES HERNANDEZ's comment about being

19   on his way meant he was in route to meet with ESTRADA and the others at this location.  My

20   opinions described herein are further bolstered by the surveillance operation and related

21   observations conducted later the same day (discussed below).

22       22.    In connection with the interceptions, agents followed OLIVARES HERNANDEZ to

23   13697 South Ave. at approximately 4:10 p.m. Based on the context of the intercepted conversations,

24   agents suspected ESTRADA had recently arrived to the Central Valley from Southern California. At

25

26   _____

    [8] Based on subsequent intercepts, I know that the person referred to a "Guero" is another one of
27   OLIVARES HERNANDEZ's co-conspirators, who has been intercepted in several drug-related
conversations.  Based on my review of those conversations, I believe "Guero" assists OLIVARES
28   HERNANDEZ in the unloading of drugs secreted inside vehicles with hidden compartments.

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

1  this location, agents observed OLIVARES HERNANDEZ meet with three unidentified Hispanic males

2  (hereafter, the "UHMs"), one of whom I believe was ESTRADA based on the previously intercepted

3  calls.

4        23.     For approximately one hour, agents observed OLIVARES HERNANDEZ and the UHMs

5  transporting objects in and around a barn located at 13697 South Ave.  Based on the interceptions and

6  surveillance observations, their observed activities are consistent with the unpacking of drugs from a

7  load car.  At approximately 5:08 p.m., agents observed a Tahoe previously driven by OLIVARES

8  HERNANDEZ leave 13697 South Ave., drive several miles away, and pull off on the side of the road

9  near a parked sedan.  Next, agents observed the drivers exit their respective vehicles and then switch

10  cars.  Agents then observed the Tahoe drive in the direction of the closest freeway and the sedan

11  returned to South Avenue.  As the sedan approached the barn, agents observed two of the UMHs open

12  the barn doors, guide the sedan into the barn, and shut the doors.  These surveillance observations are

13  consistent with the transfer of drugs and/or drug proceeds via a load car.  In short, I believe these

14  surveillance observations, coupled with the interceptions, establish probable cause that ESTRADA was

15  involved in delivering drugs and/or drug-related proceeds on such date.

16        **2.**    ***August 21, 2015: Surveillance of OLIVARES HERNANDEZ and ESTRADA***

17        24.     On August 21, 2015, agents intercepted a series of telephone calls over the Intercepted

18  Telephone 3, which indicated OLIVARES HERNANDEZ expected another drug delivery from

19  ESTRADA.  In connection, agents established ground and aerial surveillance at or near 13697 South

20  Ave. in anticipation of ESTRADA's arrival from Southern California.  At approximately 1:45 p.m.,

21  agents observed a Chevrolet Tahoe, which was similar to one previously driven by OLIVARES

22  HERNANDEZ.[9]  Agents believe OLIVAEES HERNANDEZ was the driver of the Tahoe for a number

23  of reasons, including the fact that physical location data obtained from the Intercepted Telephone 3

24  placed him at 13679 South Ave. during this time period.

25        25.     At approximately 2:24 p.m., agents observed a white sedan exit the barn located at 13679

26

---

27      [9] Agents were unable to conduct close-range ground surveillance because of the remote nature of the location on South Ave.  As such, the primary physical surveillance observations were gleaned from

28  aerial surveillance.

1 │ South Ave.  The sedan drove to a nearby intersection on Collier Road and pulled over to the side of the

2 │ road.  At approximately 2:48 p.m., agents observed a BMW sedan park next to the white sedan on the

3 │ side of the road.  The drivers switched their respective vehicles.  Next, the white sedan drove towards

4 │ the nearest freeway and the BMW returned to 13679 South Ave.  Once again, agents observed multiple

5 │ Hispanic males moving around the property, including into and out of the barn.

6 │      26.    At approximately 3:10 p.m., agents observed a Nissan truck[10] arrive at 13679 South Ave.

7 │ At the same time, agents intercepted a call via the Intercepted Telephone 3, in which ESTRADA

8 │ indicated he had arrived at the address.  Agents then observed a Nissan truck (presumably driven by

9 │ ESTRADA based on the interceptions and his established connection to the vehicle) enter and park in

10 │ the barn.  At approximately 3:52 p.m., agents observed a blue Tahoe (later determined to be driven by

11 │ OLIVARES HERNANDEZ) leave the property and drive to 14105 El Capitan Way in Delhi, California,

12 │ where he met with a suspected drug customer.[11]  Agents also later followed ESTRADA as he departed

13 │ from 13697 South Ave.  Your affiant identified the driver of the Nissan truck as ESTRADA soon after

14 │ he departed the location.

15 │      27.    I believe the surveillance observations described in the subsection herein relate to drug

16 │ trafficking activities.  For example, I believe the activities observed at the barn and the related transfer

17 │ of vehicles is consistent with the transfer and/or unloading of load cars carrying drugs and/or drug-

18 │ related proceeds.  I know it is common for higher-level drug traffickers to use hidden compartments to

19 │ transport drugs and/or drug-related proceeds.  Given the bulk quantities involved in such transport, I

---

[10] Of note, the described Nissan truck driven is the same one driven by ESTRADA at the time of his traffic stop and subsequent arrest on October 12, 2015.

[11] At El Captain Way, agents observed OLIVARES HERNADNEZ meet with the driver of a parked blue sedan.  OLIVARES HERNANDEZ retrieved a container resembling a cooler from the rear of the blue Tahoe.  He then placed the cooler in the trunk of the blue sedan.  Next, the driver of the blue sedan emptied the contents of the cooler into his vehicle.  Meanwhile, OLIVARES HERNANDEZ walked into a nearby orchard while empty-handed.  Moments later, OLIVARES HERNANDEZ returned from the orchard with an object in hand and placed it into the rear of the blue Tahoe.  Soon thereafter, the two parties met at the rear of their vehicles and then departed the area separately.  The observed behavior, including the brief nature of the meeting, the remote location that provided counter-surveillance cover, and the involvement of a known drug distributor (i.e. OLIVARES HERNANDEZ) is consistent with a drug transaction.  Afterwards, agents followed OLIVARES HERNANDEZ in the blue Tahoe back to 13670 South Ave. where he was observed in possession of the cooler and entering into the barn.  OLIVARES HERNANDEZ's return to the barn is also consistent with a drug dealer returning to a stash location with funds obtained from the same of controlled substances.

1  know such drug traffickers may switch vehicles to facilitate the transfer of such items concealed within

2  the vehicle, as opposed to unpacking and/or directly transferring the drugs and/or drug-related proceeds.

3  As such, I believe the vehicle switches observed this case are indicative of drug trafficking activities.

4  (Indeed, in the instant case, agents discovered bulk cash secreted within the Nissan truck at the time of

5  ESTRADA's arrest.)

6                 **3.**     **August 22, 2015: Suspected Retrieval of Drug Proceeds by ESTRADA**

7         28.     The day after the above-observed activities, agents against identified another suspected

8  transaction involving ESTRADA and associates of the subject DTO. More specifically, I believe

9  ESTRADA returned to 13697 South Ave. to retrieve payment for previously delivered narcotics. The

10 interceptions and related surveillance observations connected to these activities on August 22, 2015, are

11 described below:

12        a.     <u>Intercepted Communication:</u>  On August 22, 2015, at approximately 8:54 a.m.,

13 the OLIVARES HERNANDEZ used the Intercepted Telephone 3 to call ESTRADA at (909)

14 963-4429. During the conversation, ESTRADA told OLIVARES HERNANDEZ, "He would be

15 arriving there in about 2 hours." OLIVARES HERNANDEZ said, "He was thinking of leaving

16 that over there with GUERO." OLIVARES HERNANDEZ instructed ESTRADA, "Go straight

17 to GUERO's and he would call GUERO right now." OLIVARES HERNANDEZ asked

18 ESTRADA, "what number ESTRADA would be taking." ESTRADA responded, "Whatever he

19 (OLIVARES HERNADEZ) wanted to give." ESTRADA further stated, "He (OLIVARES

20 HERNANDEZ) could give ESTRADA everything, but it was whatever he wanted."

21 OLIVARES HERNANDEZ agreed and said he "would call GUERO and then call [ESTRADA]

22 back."

23        b.     <u>Significance of Communication:</u>  I believe the above-described conversation

24 relates to the retrieval of drug-related proceeds by ESTRADA from OLIVARES HERNANDEZ

25 and GUERO. I further believe ESTRADA's comment about "arriving in two hours" was

26 provided as an instruction to OLIVARES HERNANDEZ to prepare the drugs proceeds for pick-

27 up. OLIVARES HERNANDEZ's explanation to ESTRADA that he was, "leaving that over

28

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

there with GUERO" was a coded response to providing the bulk currency to an associate referred to as "GUERO" (UM-5). OLIVARES HERNANDEZ then asked "what number" to confirm the amount of currency ESTRADA expected to receive and transport back to Southern California.

      c.    Related, Follow-up Intercepted Communication: At approximately 8:57 a.m., OLIVARES HERNANDEZ used the Intercepted Telephone 3 to call ESTRADA a second time. OLIVARES HERNANDEZ said, "He [GUERO] would be seeing [ESTRADA]." OLIVARES HERNANDEZ added, "He would be leaving the letter signed and everything so that all he had to do was read it." OLIVARES HERNANDEZ asked ESTRADA if he wanted him to "complete a hand." Then, OLIVARES HERNANDEZ asked, "What was there was only like 353?" ESTRADA responded it was "fine" and he would "figure it out with GUERO."

      d.    Significance of Related, Follow-Up Intercepted Communication: I believe the participants in the conversation above used code to convey that GUERO would meet ESTRADA and provide ESTADA with $353,000 (referred to in shorthand as "353") on behalf of OLIVARES HERNANDEZ. I believe OLIVARES HERNANDEZ said he would "leaving the letter signed" and all ESTRADA had to do was "read it" to relay that the currency was already counted, marked, and ready for transportation. OLIVARES HERNANDEZ use of the word "hand" and "353" to ask whether ESTRADA expected $500,000 or if $353,000 will be sufficient. The phrase "hand" is commonly used by drug traffickers as shorthand for five. In this instance, I believe it is used as code for $500,000, which is consistent with the transport of bulk proceeds.

**D.**    **Additional Information Regarding ESTRADA's Travel and Its Significance**

    29.    In August of 2015, agents obtained court authorization to capture physical location data from ESTRADA's predecessor cellular telephone. The data obtained from his device revealed that ESTADA likely resides part-time in Southern California and often travels throughout the state. The data also indicated that ESTRADA frequently travels to the U.S.-Mexico border, whereupon the physical location data would terminate, and then reactive a few days later in Southern California. This pattern of data collection is consistent with ESTRADA crossing into Mexico, staying a few days, and then

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

14

1    returning to United States. Further, information obtained from the Department of Homeland Security

2    ("DHS") also indicates ESTRADA and/or his vehicle have regularly crossed the U.S.-Mexico border in

3    2015. I know it is common for high-level couriers to smuggled drugs and/or drug-related proceeds

4    across the border to Mexico-based members of DTOs that smuggle drugs into the United States. Given

5    ESTRADA's involvement in drug trafficking, as discussed herein, I believe ESTRADA may operate in

6    such capacity based on the frequency of his trips, as well as the interceptions, activities, and data

7    gathered in the subject investigation.

8    **E.**    **Overview of Surveillance and Drug Delivery by ESTRADA's Co-Conspirator, OLIVARES HERNANDEZ, to a Dealer Selling Drugs to the UC**

9

10    30.    The drug trafficking organization involving OLIVARES HERANDEZ and his co-

11    conspirators, including ESTRADA, have multiple connections to the San Francisco Bay Area and

12    NDCA. For example, agents have tracked members of the DTO making drug deliveries to suspected

13    customers in the NDCA.[12] In addition, the UC has repeatedly purchased drugs from a bulk-level drug

14    dealer supplied by OLIVARES HERNANDEZ. The UC has placed numerous calls coordinating these

15    drug transactions from the NDCA, including Contra Costa County.[13] Outlined below is an overview of

16    one the UC's purchases from a dealer/co-conspirator supplied by OLIVARES HERNANDEZ's DTO.

17    As established above, OLIVARES HERNANDEZ's DTO includes ESTRADA and he is therefore

18    likewise connected to the distribution of drugs tied to the NDCA.

19    *1.*    *August 17, 2015: OLIVARES HERNANDEZ Supplies One-Half Kilogram of Cocaine Later Sold to the UC*

20

21    31.    Between August 13 and 17, 2015, the UC coordinated and placed a cocaine order from a

22    drug dealer supplied by OLIVARES HERNANDEZ, who is referred to herein as the "Dealer." On

23

24    [12] Further, communications intercepted via the Intercepted Telephone 3 have included discussions of customers and/or co-conspirators in Oakland, Hayward, and other Bay Area locations. I also know it is also common for San Francisco Bay Area based drug traffickers to use sources of supply

25    located in the California Central Valley, which operates as a thoroughfare and/or distribution point for drugs moving from Mexico to the NDCA.

26    [13] *See, e.g., United States v. Gonzalez*, 683 F.3d 1221 (9th Cir. 2012) (when a conspirator uses a

27    telephone call, by whomever initiated, to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into that of the person with

28    whom he is speaking).

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

15

August 17, 2015, the Dealer met with the UC and delivered one-half kilogram of cocaine[14] in exchange for $15,000. On such date, agents used physical and electronic surveillance to track the Dealer and OLIVARES HERNANDEZ. Shortly before the drug transaction between the UC and the Dealer, agents tracked and/or observed the Dealer travel from his residence and meet with OLIVARES HERNANDEZ. Based on the following observations and intercepted communications, I believe there is probable cause that OLIVARES HERNANDEZ supplied the cocaine ultimately sold to the UC by the Dealer:

      a.    <u>Placement of Order By UC with the Dealer:</u> The cocaine sale to the UC started with a call on August 13, 2015 at approximately 3:58 p.m., in which the UC placed a recorded called to Dealer. The UC told the Dealer that he/she wanted to "see him (i.e. the Dealer) today" for "half a square" (i.e. code for one-half kilogram of cocaine). The Dealer confirmed the quantity by asking, "half a square?" and the UC affirmed. The Dealer then said he "needs to call first to see if he had it because there's hardly any of that left." The Dealer agreed and said he would call the UC back. The UC asked the Dealer to give the UC "the number" as well. The Dealer acknowledged.

      b.    In the call above, I believe the Dealer understood the UC's request for one-half kilogram of cocaine ("half a square") and responded he needed to contact his supplier (i.e. OLIVARES HERNANDEZ) to see if the desired amount was available (i.e. "see if he had it").

      c.    <u>Placement of Order by the Dealer with OLIVARES HERNANDEZ:</u> Shortly after the Dealer's conversation with the UC, and at approximately 4:13 p.m., the Dealer contacted OLIVARES HERNANEZ via the Intercepted Telephone 3 (Call No. 39). During the call, OLIVARES HERNANDEZ said he was at the "laguna" (the Spanish word for "lake") and would call the Dealer later. The Dealer asked OLIVARES HERNANDEZ to see if there was "anything" (i.e. a coded reference to checking on the availability of cocaine).

      d.    <u>Follow-Up Call Between the Dealer and the UC:</u> At approximately 4:14 p.m., the Dealer placed a recorded called the UC. The Dealer explained he "just spoke with [his supplier]

---

[14] The purchased substance tested presumptively positive for the presence of cocaine. A final analysis is pending at the DEA Western Regional Laboratory.

SICORD AFF. IN SUPPORT OF COMPL.
**[UNDER SEAL]**

who was at the lake" (i.e. OLIVARES HERNANDEZ).  The UC asked what the price was "for the half" and the Dealer clarified by asking the UC if he/she was asking about "half the motor" (i.e. one-half of a kilogram) and the UC affirmed.  The Dealer said he, "didn't know because third party needed to tell him the cost" (i.e. he needed to confirm the price with his supplier, OLIVARES HERNANDEZ).  The Dealer further explained he "had called [his supplier] the other day and asked for the price for one which [the supplier] said was 29" (i.e. $29,000 per kilogram).  The Dealer said the, "[supplier] sometimes raised the price since it's only a half" (i.e. the price may increase because the requested amount was less than a full kilogram).  The UC asked, "if it was the same" (i.e. whether the quality of the cocaine matched his/her prior purchases).  The Dealer responded, "the one he had now was really good" (i.e. the current product quality was good).  The Dealer then agreed to call the UC again after speaking further with his supplier.

        e.    Calls Finalizing the Supply of Cocaine for Transaction with the UC:  On August 14, 2015, at approximately 3:21 p.m., the Dealer placed a recorded called the UC.  During the call, the Dealer said his supplier (i.e. OLIVARES HERNANDEZ) called and said "it [i.e. the drugs] was there and for half it would be 15 pesos [i.e. $15,000]."  The UC and the Dealer then agreed to meet on August 17, 2015 to conduct the purchase.  Prior to this call, agents intercepted a communication between the Dealer and OLIVARES HERNANDEZ (using the Intercepted Telephone 3) at approximately 12:04 p.m. confirming the availability of cocaine (Call No. 60).  On August 17, 2015, at approximately 12:45 p.m., agents established surveillance at the Dealer's residence.  At approximately 2:10 p.m., the UC called the Dealer to discuss their readiness to conduct the anticipated cocaine transaction.  The UC said he/she was on his/her way to their meet location and would call the Dealer when the UC arrived.  The Dealer acknowledged.  Immediately after the call with the UC, the Dealer called OLIVARES HERNANDEZ on the Intercepted Telephone 3.  During the call, the Dealer asked if OLIVARES HERNANDEZ was ready.  OLIVARES HERNANDEZ told the Dealer to stop by and meet at "the pollos" (Spanish for "chickens").  The Dealer also asked OLIVARES HERNANDEZ "how much for the entire

motor" (a "motor" is slang for one kilogram of cocaine). OLIVARES HERNANDEZ asked if the Dealer was ready and the Dealer said that he's going to "the pollos" now.

      f.    Surveillance Observations Surrounding UC's Purchase of Cocaine:

Approximately 15 minutes after the last call described above, agents observed the Dealer leave his residence, enter a vehicle, and depart the area. Ground and aerial surveillance units followed the Dealer to 14105 El Capitan Way, Delhi, California. Upon arrival, the Dealer drove down the long driveway then parked next to a white sedan positioned under a tree adjacent to the residence. Agents observed the Dealer exit his vehicle and meet with OLIVARES HERNANDEZ between their vehicles. Next, agents watched OLIVARES HERNANDEZ walk towards the residence at 14105 El Capital Way, briefly disappear from sight, and then return moments later. Once again, OLIVARES HERNANDEZ met with the Dealer briefly before both men entered their respective vehicles and drove away from the location in opposite directions. Next, agents followed the Dealer directly to the parking lot of a gas station, which was the prearranged meeting for the Dealer and the UC to conduct the cocaine transaction. At the meet location, the Dealer entered the UC's vehicle and provided him/her with one-half kilogram of cocaine in exchange for $15,000.

    32.    In sum, based on the intercepted calls, the timing of the Dealer's meeting with the OLIVARES HERNANDEZ, the brief nature of the exchange, and other investigative facts discussed herein, I believe OLIVARES HERNANDEZ provided cocaine to the Dealer, which was in turn sold to the UC. I further believe that OLIVARES HERNANDEZ referred to the meeting location with the Dealer in code as meeting by the "pollos." And, I believe the Dealer's understanding of the coded reference means they have used this location on prior occasions to conduct drug transactions and therefore have an established customer-supplier relationship. As mentioned previously, the UC has purchased drugs from the Dealer on multiple occasions, thereby connecting the Dealer's supplier (i.e. OLIVARES HERNANDEZ) and his DTO to drug distribution with ties to the NDCA.

**F.**    **Criminal History of Gabriel ESTRADA**

    33.    I was told by another DEA agent who reviewed a criminal history report of Gabriel

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

ESTRADA that he has been convicted for felony possession of marijuana for sale (1997); felony conviction for selling marijuana (1997); and an arrest for felony possession and sale of marijuana (2010).  In addition, ESTRADA admitted when he was booked into jail on October 12, 2015 that he has been arrested previously for the distribution of marijuana at or near the U.S.-Mexico border.  On a related note, the case agents in the subject investigation have learned that ESTRADA was arrested in Mexico in approximately 2012 while in possession of distribution quantities of marijuana and methamphetamine while attempting to travel across and/or destined for the U.S.-Mexico border.  The outcome and details of this arrest are presently unknown.

**IV.  SEALING REQUEST**

34.    I believe that, should the contents this affidavit and complaint be made public, it would jeopardize this continuing investigation and law enforcement personnel participating in this investigation.  I also know, based upon my training and experience, that if those communicating with ESTRADA and/or his co-conspirators learn of the existence and scope of the subject investigation, they may have the opportunity to destroy other evidence, notify co-conspirators, and/or cause co-conspirators to flee from prosecution.  For the foregoing reasons, and because this is an ongoing investigation, I request that the complaint and the accompanying affidavit be sealed until further order of the Court to avoid the aforementioned adverse results.

///
///
///

SICORD AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]

1  V.    **CONCLUSION**

2        31.    Based on the foregoing facts, my training and experience, and consultation with other law

3  enforcement agents with experience in drug trafficking investigations, I believe there is probable cause

4  to believe that Gabriel ESTRADA violated 21 U.S.C. §§ 846 and 841 (a)(1), (b)(1)(A)(viii) (conspiracy

5  to distribute and possession with intent to distribute controlled substances, including cocaine and 50

6  grams or more of methamphetamine, its salts, isomers, and salts of its isomers) beginning on a date

7  unknown, but no later than August 13, 2015 and continuing to October 12, 2015 in the Northern District

8  of California.   I further believe there is probable cause that ESTRADA conspired with OLIVARES

9  HERNANDEZ and other DTO associates to distribute drugs.

10

11                                                    _____
                                                      WILLIAM F. SICORD

12                                                    Special Agent
                                                      Drug Enforcement Administration

13

14  Subscribed to and sworn before me
    this 13th day of October, 2015.

15

16

17  _____
    HONORABLE DONNA M. RYU

18  United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

SICORD AFF. IN SUPPORT OF COMPL.
[**UNDER SEAL**]
                                        20